IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
May 14, 2019 Session

## STATE OF TENNESSEE v. KIMBERLY MILLER

**Appeal from the Circuit Court for Maury County**
No. 24831    Stella L. Hargrove, Judge

_____

### No. M2018-00869-CCA-R3-CD

_____

The Appellant, Kimberly Miller, was convicted of first degree premeditated murder and first degree felony murder. The convictions were merged, and she was sentenced to life imprisonment. On appeal, she challenges the sufficiency of the evidence underlying her convictions. Specifically, the Appellant contends that the evidence "does not show that it was [the Appellant's] conscious desire to kill the victim in this case, nor that she acted in concert with the shooter, or that she was an active participant in the shooting." Therefore, she could not be found criminally responsible for the first degree premeditated murder of the victim. The Appellant also contends that "the evidence unquestionably established that [the Appellant] did not share the intent of [the victim's] assailants nor did she actively participate in any facet of the armed robbery and subsequent shooting"; therefore, she cannot be held criminally responsible for the felony murder of the victim. Upon review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN and ROBERT H. MONTGOMERY, JR., JJ., joined.

Jonathan L. Miley, Nashville, Tennessee (on appeal), and Stanley Pierchoski, Pulaski, Tennessee (at trial), for the Appellant, Kimberly Miller.

Herbert H. Slatery III, Attorney General and Reporter; Caitlin Smith, Senior Assistant Attorney General; Brent A. Cooper, District Attorney General; and Daniel Runde, Assistant District Attorney General, for the Appellee, State of Tennessee.

## OPINION

# I. Factual Background

The Appellant was charged with first degree premeditated murder and first degree murder in the perpetration of or attempted perpetration of a robbery. On April 2, 1994, the twenty-one-year-old victim, Christopher Heiss, a deliveryman for Papa John's Pizza, was shot and killed in front of a residence at 1825 Paul Drive in Colombia. The Appellant lived at the residence with her mother. During the shooting, the victim's car, a red Nissan 200SX, was stolen. No one was charged in the crimes, and the Appellant was not implicated until 2016, when two witnesses informed the authorities of statements the Appellant had made regarding her involvement in the crimes.

At trial, Marie Heiss testified that she and her husband, Robert (Bob) Heiss, Sr., and their two sons, Robert, Jr., and Christopher, moved from Buffalo, New York, to Columbia, Tennesee, in 1988 because of her husband's job transfer with Saturn. At the time of the move, Robert was eighteen years old and had graduated from high school. The victim, who was fifteen or sixteen years old at the time of the move, attended Columbia High School but did not graduate. However, he obtained his general education development diploma (GED).

Mrs. Heiss said that at the time of his death, the victim worked at Papa John's Pizza (hereinafter "Papa John's") and had been there for approximately two years. The victim delivered pizzas and occasionally managed the restaurant.

Mrs. Heiss acknowledged that in the weeks leading up to his death, the victim had a problem with marijuana. Approximately two to four weeks prior to the victim's death, she found a package of marijuana the victim had hidden in their house. At her request, Mr. Heiss "disposed of" the package. Afterward, the victim asked if she had "any idea what [she had] done." Mrs. Heiss was not concerned because she thought he was upset that he had spent money for marijuana he did not get to smoke. Later, the victim began acting "jumpy" and "paranoid," and "he would look out the window at times." She was concerned but did not think he was in danger.

Mrs. Heiss said that before the victim left for work at Papa John's on the day of the offense, he asked her to call a counselor at the hospital to see if he could get admitted into a rehabilitation program. Mrs. Heiss was "grateful" that he wanted treatment for his drug problem. She wanted to help him but was unable to reach anyone at the hospital because it was the Saturday before Easter. She told the victim that she would call him at work if anyone returned her call.

Mrs. Heiss said that normally the victim was home from work by 11:30 p.m., but that night he had planned to meet his brother after work. Mr. and Mrs. Heiss were in bed

when Robert ran into the house and said, "Somebody has killed my brother." Robert explained that someone had told him he needed to go to the hospital. When he arrived at the hospital, he learned that the victim was dead.

Mrs. Heiss said that prior to the victim's death, she had heard of Ricky Bell and Jason Bradburn but that she had never heard the Appellant's name mentioned and did not remember hearing of Bobby Bishop. After the victim's death, she learned that the victim's drug use was not limited to marijuana, and she acknowledged that he was probably associated with people she and her husband did not know.

Mr. Heiss testified that around the beginning of March 1994, Mrs. Heiss found a bag of marijuana hidden in the stereo speakers in the victim's room. Mr. Heiss said the bag was a "typical brown-bagger's [paper] lunch bag." Mr. Heiss did not look inside the bag, but he could tell that the marijuana was loosely packed and that the bag was not completely full. Mrs. Heiss wanted the bag out of the house, so Mr. Heiss took it to a vacant lot around the corner from their house and left it near some bushes or trees.

Mr. Heiss said that "[t]here was a period in there probably for a week or two weeks or so that [the victim] was looking over his shoulder everything he did." Mr. Heiss said that the victim seemed "very nervous," "paranoid," and "on edge." Mr. Heiss recalled one occasion when he and the victim were outside together and a car drove into the cul-de-sac where they lived. The victim said, "Here they come."

After Mr. and Mrs. Heiss discovered the bag of marijuana, they told the victim to leave the house. Approximately a week later, the victim "was desperate" and "begged" his father to tell him where he had put the marijuana, and Mr. Heiss told him. Mr. Heiss assumed the victim probably had retrieved the bag. They allowed the victim to return to the house, and he had been back for one or two weeks at the time of his death.

Mr. Heiss said that shortly before his death, the victim bought a red Nissan 200SX with a manual transmission, possibly a 1989 model, which Mr. Heiss described as a "schoolteacher's type car." The victim drove the Nissan to work on the day of the offense. Before the victim's death, Mr. Heiss was not aware of any problems with the clutch. After the victim's death, Mr. Heiss spoke with a mechanic where the car had been towed and learned that the clutch was "blown out" and "inoperable."

Dr. Feng Li testified that he was the chief medical examiner for Metropolitan Nashville and Davidson County. Without objection, Dr. Li testified as an expert in forensic pathology. Dr. Li said that he had reviewed the autopsy report on the victim's body, which was performed by Dr. Charles Harlan on April 3, 1994. Dr. Li said the autopsy protocol would have been the same in 1994 as it was at the time of trial. As part

of the autopsy, the victim's blood was tested, and it was positive for cocaine, cocaine metabolite, marijuana, and marijuana metabolite. Dr. Li could not determine when the victim took the drugs.

Dr. Li said that the autopsy report reflected that the victim was a white male, that he was sixty-five inches tall, that he weighed 147 pounds, and that he was twenty-one years old. The victim had a gunshot wound that entered his chest and one that entered the right side of his head. The bullet to the chest passed through the aorta, heart, and left lung and exited the left side of the victim's back. The bullet caused bleeding in the chest cavity and around the heart. The other bullet caused "a near contact wound to the head" and exited behind the victim's left ear. From stippling, Dr. Li determined the gunshot to the head was fired from an intermediate range, which was approximately two to three feet. Dr. Li did not see any stippling around the gunshot wound to the chest and surmised that it was likely fired from a distant range.

Dr. Li said that the report reflected the victim's body had multiple skin abrasions and rib fractures. Two of the victim's right posterior ribs and five of his left ribs were "cracked, broken." Dr. Li surmised that the victim's rib injuries were consistent with someone of his size being run over by an automobile. He clarified, "[I]f [the body] is completely run over, usually you will see more damage. May be hit. May be dragged. These are more consistent [with being hit and dragged]." Specifically, Dr. Li said that the abrasions were more consistent with a body being dragged over a roadway and that "probably the rib fractures can be caused by [a] strike."

On cross-examination, Dr. Li explained that the victim's blood and urine were drawn as part of the autopsy and submitted to the Tennessee Bureau of Investigation's (TBI) laboratory for testing. Dr. Li explained that the marijuana and cocaine found in the victim's bodily fluids were in small amounts.

Dr. Li acknowledged that he could not determine from the autopsy findings whether the victim's body had been lying face up or face down at the time of the abrasions and fractures to the ribs. Dr. Li indicated that usually a body would have had more internal damage than the victim's if it had been run over by an automobile. He noted that different injuries could occur depending on the size of the vehicle inflicting the injuries.

Dr. Li said that Dr. Harlan died in 2013 and that he lost his medical license in 2005. Dr. Li said that the autopsy report appeared to be "adequate."

Michelle Jones, the Assistant Chief of Police with the Columbia Police Department, testified that she started working with the police department in 1989 as a

dispatcher and became a patrolman approximately four years later. She graduated from the police academy in 1993, and in April 1994, she was working as a patrol officer. She acknowledged that at the time of the victim's death, she had not received any specialized training in crime scene investigation.

Assistant Chief Jones said that around 11:20 p.m. on April 2, 1994, she received a call from the police dispatcher reporting a shooting that had occurred around 1825 Paul Drive and that a man lying in the street was not moving. She was only a minute or a minute and a half away from Paul Drive. On her way to the scene, she passed through a red light at the intersection of Highland Avenue and 17th Street/Hatcher Lane and saw a small red car stopped on the side of Highland Avenue near the intersection. She thought the vehicle was yielding to her blue lights and siren. Next to the car, she noticed a white male with an average build and "longer hair," who was wearing a dark shirt with several buttons on the front. The man was "standing there putting a sign inside the car on the passenger side." She thought that was odd, but she had no reason to stop.

Assistant Chief Jones was one of the first officers on the scene of the shooting. Several people were rendering aid to the victim, who was lying in the middle of the street in front of a residence where the Appellant resided with her mother. Other people were coming out of their homes. Assistant Chief Jones tried to get the names of everyone present and attempted to keep people from coming too close to the "main area." She checked the victim and could not find a pulse. Officer Johnny Luttrell, who was deceased at the time of trial, approached her with an insulated red pizza cover from Papa John's. Assistant Chief Jones identified the bag in court and stated that the notation on the bag indicated that the dark stains appeared to be body fluid, "possibly blood."

Assistant Chief Jones said that she and Officer Luttrell, who were both patrol officers, were in charge of the scene until a detective arrived. When Assistant Chief Jones learned that the victim's car had been taken, she advised her supervisor of the vehicle she had seen on her way to the crime scene. The officers designated the location of the car as a second crime scene. Assistant Chief Jones was dispatched to the second crime scene to investigate the vehicle and traveled back and forth between the scenes.

Assistant Chief Jones said that neither she nor any other officer was asked to tape off either of the crime scenes. At that time, the officers did not carry yellow crime scene tape in their patrol cars, so that was not unusual. Assistant Chief Jones acknowledged that no one kept a log of who entered or exited the crime scene.

Assistant Chief Jones identified photographs of the scene where the victim was found. A "wet stain" that appeared to be blood was in the roadway near the body. She acknowledged that at that time she had not received any training in analyzing blood

spatter. She also recalled seeing various items for medical treatment, such as gauze and tubing. She identified from a photograph two pairs of shoes and a ball cap that were similar to ones she saw at the scene. Assistant Chief Jones also recalled seeing two shell casings and one bullet in the street. She did not know if anyone collected the shoes, cap, shell casings, or bullet. She identified two evidence envelopes which contained a shell casing collected from the pavement in front of 1825 Paul Drive. Assistant Chief Jones surmised that the shell casings appeared to be .380 caliber. Assistant Chief Jones also identified an evidence envelope containing a bullet found on the pavement in front of 1825 Paul Drive. The bullet appeared consistent with the size of the shell casings.

Assistant Chief Jones said that one year after the shooting, she was asked to write a supplemental report on the victim's case. She acknowledged that writing a supplemental report one year after the incident was unusual. In her report, she accidentally omitted that she had seen a white male standing beside the red car near the intersection.

Assistant Chief Jones said that the police procedures for collecting evidence and handling crime scenes in 1994 and the procedures used at the time of trial were "totally different." Assistant Chief Jones noted that at the 1994 crime scene, none of the evidence was marked with a numbered evidence marker. She said that currently, every police officer and detective had numbered evidence markers in the back of their patrol cars. She agreed that in 1994, yellow crime scene tape was not used to secure the scene and that civilians were inside the crime scene, which would not happen under current protocols.

Assistant Chief Jones said that Detective Mark Stooksbury, who was assigned to the case before she was, had a warrant issued for the arrest of a man named Bishop in connection with the victim's case. However, the warrant was retracted before it was served. Assistant Chief Jones did not know why the warrant was retracted or why Bishop was never charged. After Assistant Chief Jones was assigned to the case, she did not seek a warrant or indictment against Bishop because she did not think there was enough information to establish probable cause.

Assistant Chief Jones said that after she was promoted to lieutenant, she assigned the case to other detectives. Assistant Chief Jones thought based upon the information she had that Bishop was involved in the victim's murder, that the Appellant did not act alone, and that other individuals were involved. Assistant Chief Jones acknowledged she had no solid evidence that the Appellant actually "pulled the trigger" of the gun that killed the victim.

On cross-examination, Assistant Chief Jones said that the victim's murder was the first homicide on which she worked. She said that when she saw the red car at the

intersection of Highland Avenue and 17th Street, the doors were closed. The white male was standing outside on the passenger side of the car and was removing a lighted Papa John's sign from the car. He put the sign inside the car through the passenger window. She did not realize the car was related to the shooting until she arrived at the scene. Assistant Chief Jones said that she did not see the man's face, explaining that as she "went by, he kind of hid his face behind the sign." At some point, she conducted interviews related to the instant case. She did not recall telling interviewees that Ricky Bell was the person she saw by the red car but acknowledged that she may have.

On redirect examination, Assistant Chief Jones agreed that she was not required to tell suspects the truth during interviews and that it was common practice to "bluff" during an interview in order to elicit a response. If she had mentioned Ricky Bell to another suspect during an interview, she could have been doing so to get an admission or confession. She asserted that if she could have positively identified Ricky Bell as the person who removed the sign from the red car, she would have had him arrested.

Corporal Jason Sanders testified that in 2014, he was a detective and was assigned to work on the victim's case. During that time, Tommy Goetz, an investigator with the district attorney's office, contacted Corporal Sanders, and they worked together on the case.

Corporal Sanders said that in the back hatch compartment of a Firebird, which was later determined to belong to Thomas Arthur Davis, the police found a "Southern Cal" baseball cap and a white washcloth that were related to the case. The police submitted the cap and washcloth to the TBI for fingerprinting and DNA testing. Testing revealed DNA from multiple contributors on the ball cap and the washcloth, but the results were inconclusive as to the identities of the contributors.

Corporal Sanders said that three Lord Calvert whiskey bottles, a Hawaiian Punch can, and a Bud Light bottle found in the victim's Nissan were submitted to the TBI for fingerprinting and DNA testing. A fingerprint on one of the whiskey bottles was identified as the fingerprint of Thomas Gordon Davis,[1] and Investigator Goetz spoke with him. The TBI report regarding the ball cap stated that "the major contributor profile was consistent with an unknown female source."

Corporal Sanders said that he had seen Shannon Arntz' name in the casefile. Investigator Goetz spoke with Arntz, and, thereafter, the Appellant was arrested.

---

[1] Two individuals mentioned in this case, Thomas Gordon Davis and Thomas Arthur Davis, have the same first and last name. Therefore, for clarity, we will refer to these individuals as "Thomas Gordon" and "Thomas Arthur."

Corporal Sanders did not believe the Appellant was the only person involved in the victim's murder. He said that Bobby Bishop was a suspect but that Bishop had died before Corporal Sanders could speak with him. Corporal Sanders also suspected that Kenneth Richard Bell, who was also known as Ricky or Rick Bell, was involved in the crime. Corporal Sanders said that Jason Bradburn and Kerry Brown were also suspects.

On cross-examination, Corporal Sanders noted that Thomas Gordon Davis' thumbprint was on the whiskey bottle. The Hawaiian Punch can had one hole punched in each side and was dented in the middle. He said that the can was used to smoke marijuana, "kind of like a homemade bong." Corporal Sanders acknowledged that a partial palm print was found on the exterior door but "nothing was identifiable." He stated "there were some [prints] that were inconclusive but no identifiable prints indicating [the Appellant]."

Thomas Gordon Davis testified that he did not know the victim personally but that they had a mutual friend, Jerry Johnson, who worked at Papa John's. Thomas Gordon denied having any involvement in the victim's death. He acknowledged that his thumbprint was on a whiskey bottle found in the victim's car. He said he and Johnson "drank together all the time," and they sometimes drank whiskey from the same bottle. He surmised that Johnson could have put the whiskey bottle in the victim's car. He recalled that, "a lot of partying [was] going on" during that time, and he did not remember meeting the victim or drinking with him. He agreed that the shooting occurred on "Mule Day weekend of 1994" and that he could not remember where he was that weekend.

Lawrence Nelson testified that in 1994, he lived at 222 Pickens Lane in Columbia. Nelson lived in one half of a duplex, and Thomas Arthur Davis lived in the other half. Nelson and Thomas Arthur got along well. Nelson was married at the time, but Thomas Arthur was single. Nelson's former sister-in-law occasionally "hung out" with the Appellant. Nelson explained, "I knew of [the Appellant] more than I knew her." The Appellant lived behind Nelson, and "her backyard was to [his] backyard." Nelson said that in Spring 1994, Thomas Arthur bought a black Pontiac Firebird Trans Am with a hatchback. Nelson knew that the Appellant and Thomas Arthur "had interaction," and Nelson had seen the Appellant drive Thomas Arthur's Firebird "a handful of times."

Nelson recalled that on April 2, 1994, Thomas Arthur was in Michigan visiting his father, and Nelson saw the Appellant driving Thomas Arthur's Firebird. That night, a pizza deliveryman was shot on Paul Drive. Nelson said that he had been to Walmart, and when he got home, "it looked like Christmas morning with all of the lights going everywhere and a bunch of commotion going on." Nelson heard that the police were looking for either Thomas Arthur or his car. Nelson spoke with the officers and told

them he knew where Thomas Arthur was. Nelson called Thomas Arthur's father in Michigan who said that Thomas Arthur was out getting something to eat. Thomas Arthur called Nelson when he returned to his father's house.

Nelson said that the Firebird passed by while he was talking with the police about the car. Nelson pointed out the car to the police. He could not see who was driving the car at that time, but he knew the Appellant had driven Thomas Arthur "to the airport, or wherever they went, or took him to Andy's and she was supposed to bring the car back and leave it over at his house. And I'm not sure if I was supposed to get the keys or what, but, you know, the car was supposed to come back over there."

Thomas Arthur Davis testified that in 1994, he lived in a two-story duplex on Pickens Lane. In early 1994, he bought a black 1993 Firebird. The Appellant lived with her mother on Paul Drive, which was behind his duplex. Thomas Arthur said that he met the Appellant through Nelson's sister-in-law, Shannon. He did not know Shannon's last name. Thomas Arthur said that he "hung out" with the Appellant "[m]aybe every other weekend."

Thomas Arthur said that on April 2, 1994, he was in Michigan. He had ridden with a friend from Nashville and had planned to leave his Firebird at home in Columbia. When he was unable to find anyone else to help him, he asked the Appellant to drive him to Nashville. The Appellant agreed to return the Firebird to his driveway, give the keys to Nelson, and make sure the car remained parked in the driveway. Thomas Arthur did not give the Appellant permission to drive his Firebird while he was out of town, and he had never let her drive his car in the past.

Around 11:00 p.m. on April 2, 1994, Nelson called Thomas Arthur's father and said that the police were chasing the Firebird and that Thomas Arthur needed to return home. The next morning, Thomas Arthur and his friend drove home. The drive took approximately ten to eleven hours. When Thomas Arthur arrived on Sunday afternoon, his Firebird was not in his driveway. He eventually found his car parked on the side of the road between the duplex and the Appellant's house. The Firebird was locked. Thomas Arthur was angry and walked to the Appellant's house. The Appellant's mother came to the door, but when he asked for the Appellant, the Appellant's mother responded that the Appellant "didn't have anything to say" to him. Thomas Arthur thought that was odd, and he told the Appellant's mother that he wanted the keys to his Firebird. The Appellant's mother shut the door, and about a minute later, she opened the door, tossed the keys at him, and shut the door.

Thomas Arthur said that after he got his keys, he drove the car to his house and parked it in his driveway. Within thirty minutes, detectives came to his house, asked him

some questions, and took the Firebird. Thomas Arthur did not recognize the California ball cap or the washcloth the police found in his car. He did not know to whom the items belonged and had never seen them before that day.

Thomas Arthur said that a week after the shooting, he received a telephone call. The caller, who sounded male, said, "[Y]ou're next," and hung up. Two days later, he got another call from someone who sounded like the same person. The caller said, "[W]e're going to kill you." Thomas Arthur was frightened by the calls and informed the detectives the day after the first call. After the second call, the police suggested that he stay with friends for at least a week. He stayed away seven to ten days.

On cross-examination, Thomas Arthur agreed that he met the Appellant through neighbors, that they had a "very casual acquaintance," and that they did not have a "close, intimate relationship."

Christopher Westmoreland testified that in Spring 1994, he was nineteen years old and lived at 212 Mockingbird Drive, which was near the intersection of Highland Avenue and Hatcher Lane. He explained that his house had a carport with a "very flat roof." Westmoreland and some friends were sitting on the roof of the carport when they heard something that sounded like gunshots from the direction of Paul Drive.

Westmoreland said that Mockingbird Drive was "a very short street, and it's hard to drive fast down the street coming up the hill." Nevertheless, after he heard the shots, Westmoreland saw two cars drive "fast" past his house. The first was red and sounded as if it had engine problems, such as misfiring or trouble shifting gears. Following closely behind was a black Trans Am or Camaro, which was unusual for cars on his road. The cars stopped, and Westmoreland saw someone get out of the black car and approach the red car. Westmoreland thought the red car had "some type of Papa John's emblem on it." The person looked into the red car for less than a minute, returned to the black car, and the black car drove away. Westmoreland could not tell what the person looked like and could not discern whether the person was male or female. Sometime later, a large number of police officers arrived on the scene.

Westmoreland said that he had noticed a car that looked very similar to the black car prior to this incident. The car usually was parked at a house near the corner of Mockingbird Drive and Paul Drive.

Jason Kennedy testified that in April 1994, he was the assistant general manager at Papa John's and that he usually ran the store at night. He said that the victim was a good employee and that he made deliveries, answered telephones, and made pizzas.

Kennedy said that in April 1994, when someone called the store to place an order, the employee had to type a personal code into the computer to identify who took the order. The employee asked for the customer's telephone number and typed the number into the computer. If the customer had never placed an order, the employee asked for their telephone number and address before taking the order. Kennedy said that he had the master code and that he never shared his code with anyone.

After the order was placed in the computer, the computer "spit a ticket out on the oven side for whoever was running the oven," which usually was the delivery driver. The ticket was placed on the pizza box, the correct pizza was put in the box, and the pizza was taken from the store for delivery. Kennedy estimated that a pizza could be ready and out of the store in seven minutes.

Kennedy said that April 2, 1994, was part of "Mule Day weekend" and that the store was very busy. The store was open until approximately 11:00 p.m., and the victim and Steve Roth were the only drivers working that night. Kennedy remembered that the victim had done his usual duties, such as making pizzas, putting them in boxes, and making deliveries.

Kennedy was shown a tag that was attached to the pizza box found at the scene. He said the ticket was for a pizza that was to be delivered to 1825 Paul Drive. Kennedy could not read the telephone number associated with the order. The name given by the person who placed the order was Seth Long; however, Kennedy did not verify that Long was the person who placed the order. Kennedy looked at other records from Papa John's and said that the telephone number associated with the order was 380-1645. The records reflected that Kennedy took the order and that the victim was the delivery driver. The pizza was ordered at 10:50 p.m. and left the store at 11:02 p.m. Kennedy remembered taking the call and said the voice sounded like a female "white person." Kennedy recalled that the delivery drivers were given an incentive pay of one percent at the end of the night if they had a Papa John's sign on their cars, but he could not recall if the victim had a sign.

Kennedy said that after the shooting, the police were unable to find the victim's parents or brother. Kennedy went to the hospital and identified the driver as Chris Heiss.

Kennedy was shown another record from Papa John's, and he confirmed that an order for cheese sticks was placed on March 30, 1994, for delivery to 1825 Paul Drive. The name on the order was Miller.

Andrea Williams testified that in 1994, she lived at 1909 Paul Drive, was fifteen or sixteen years old, and was in tenth grade. Williams knew the Appellant, who was

eighteen years old and was probably a senior at the time. They had been friends since elementary school. Williams said that the Appellant had a driver's license and that she occasionally rode around with the Appellant.

Williams said that she "knew of" Thomas Arthur through Shannon Arntz, who was another girl she and the Appellant "hung out with." Williams said that Thomas Arthur and Arntz' brother-in-law were friends.

Williams recalled that Thomas Arthur had a new, black Firebird. Williams said that the Appellant drove the Firebird, "I guess whenever she wanted to drive it." She estimated that she was inside the vehicle with the Appellant more than five times. Williams could not recall whether Arntz was ever in the vehicle. Williams said she and the Appellant had "cruised" the neighborhood in the Firebird more than once prior to April 2, 1994. Williams did not recall any other black Firebirds in the neighborhood at that time.

Williams recalled that on April 2, 1994, the Appellant was supposed to come to Williams' house to get a compact disc (CD). The Appellant came by about 9:30 p.m. She was driving the Firebird and was supposed to return later to pick up Williams, but she never returned. Williams later saw "blue lights and police cars" in front of the Appellant's home. Williams saw the Appellant drive by in a black Firebird, but she did not stop.

On cross-examination, Williams said that when the Appellant came to her house around 9:30 p.m., "Troop" was in the Firebird with her. She did not know another name for Troop.

Bruce Dixon testified that in April 1994, he was living with his girlfriend, Janelle Irby, in a duplex at 1829 Dimple Court, a street which ran parallel to "short Paul Drive." Ronnie Gick lived on the other side of the duplex. Dixon, Irby, and Gick were all employed at Saturn. Dixon said that Gick died in 2018.

Dixon said that the duplex had a deck that was approximately six feet above the ground. From his deck, Dixon could see what was happening at the intersection of Paul Drive and Mockingbird Drive. Dixon said that he, Irby, and Gick were at home on the evening of April 2, 1994. Gick had a dog that was a black Labrador mix named Bear. Around 11:00 p.m., Bear and other dogs in the neighborhood started barking. Dixon heard two or three gunshots, and the dogs stopped barking. Dixon was afraid Bear had been shot, so he ran out onto the deck. Gick soon joined him on the deck.

Dixon said that while he was on the deck, he saw two vehicles in the area. He said, "One was the pizza delivery, I don't know if it was a small pick up [or] what. The other was a dark sports car, like a Camaro or a Firebird." Dixon said the Firebird was either dark blue or black. He said the Firebird usually was parked on the corner of Pickens Lane and Paul Drive. Dixon did not know Thomas Arthur Davis. Dixon said that he did not know the Appellant or her mother, but he knew they lived at 1825 Paul Drive. Dixon had never seen the Appellant driving the Firebird.

Dixon said that when he saw the red pizza delivery vehicle, it was traveling north on Mockingbird Drive and was followed closely by the dark vehicle. When asked to describe their speed, Dixon said the vehicles "weren't creeping. They were – they were moving on." Dixon heard one of the vehicles "revving" its engine and did not believe it sounded like the dark sports car.

Dixon said that while they were standing on the deck, Gick noticed the victim lying in the street, which was Paul Drive. Dixon went inside his house, called 911, and then walked down the street to the victim. Gick and Irby were already there. Irby had brought a rug and placed it over the victim's body. Dixon checked the victim's neck for a pulse, but he did not find one. Additionally, he noticed that the victim was not moving and that the victim's body felt cold. Dixon, Irby, and Gick remained with the victim until the police arrived. Dixon said that he gave a statement to the police on May 6, 1994.

On cross-examination, Dixon said that it was too dark outside to discern whether the Firebird was black or blue. He did not know if it was the same car he had seen earlier in the neighborhood but knew it was similar. When he saw the cars, they were "in motion." Dixon did not see anyone else on the street.

John Mark Faught testified that in April 1994, he was twenty-four or twenty-five years old. He acknowledged that he was convicted of a couple of shoplifting offenses in 2008 and 2009. Faught said that he was friends with the victim and that they "hung around" with the same group of friends. Faught recalled that in 1994, he did not have a car but that his girlfriend, Terri Jett, had a 1991 Corsica.

Faught said that on April 2nd 1994, he had been working as a painter. That night, Faught picked up his girlfriend's son, Jeremy, at Dairy Queen. Jeremy asked to go by a friend's house on School Street near Johnny's Market, and Faught agreed to take him. On the way, Faught saw the victim's car at the intersection of Highland Avenue and 17th Street. Faught was not sure of the time, but he estimated he saw the victim's car around 9:00, 10:00, or 10:30 p.m. An early 1990's model black Firebird was "[d]ead behind" the victim's car. Faught wondered "what was going on" because the light at the intersection was green, but neither car was moving. However, when the black car went around the

victim's car, Faught drove around the victim's car as well. The Firebird stopped, and Faught saw a man get out of the victim's car and into the Firebird. Faught noticed that the hazard lights on the victim's car were on. The man was approximately 5'10" or 6" tall, had dark brown or black hair, and was white. The windows on the Firebird were tinted, so Faught could not see whether the driver was a man or a woman. Faught said that he initially did not know the Nissan was the victim's car because the Papa John's sign was not on it. Faught did not see the Papa John's sign until he was beside the victim's car and saw the sign in the passenger seat.

Faught said that after he drove away, he realized something was wrong because the victim never let anyone else drive his car and always kept the Papa John's sign on top of the car. Faught "made the block" and returned to the victim's car. The man who had gotten out of the victim's car earlier was "behind the steering wheel trying to get the car to go. He opened the door, looked under the car, [kept] stripping the gears trying to get the car to go." The man made seven or eight attempts, but the car would not move. The black Firebird returned and pulled up behind Faught. The light turned green, and Faught drove through the intersection. He saw the Firebird stop beside the victim's car. The man got out of the victim's car and got into the passenger seat of the Firebird. The Firebird continued south on Highland. Faught backed up and tried to follow the Firebird but lost sight of it because the Firebird was driving "at a high rate of speed."

Faught said that he turned right onto Pickens Lane to look for the Firebird and saw the police lights and a lot of people standing on Pickens Lane and Paul Drive. Faught parked, and he and Jeremy walked over and saw the victim lying in the "middle of Paul Drive in a puddle of blood." Faught walked to a patrol car and asked if the person in the road was Chris Heiss. The officer responded that they had not established the victim's identity. Faught said that when he saw the victim's body, he "knew something was wrong." Faught told the officer that the victim's car was at the red light at the intersection. The officer asked how Faught knew the car belonged to the victim. Faught responded that he knew the victim and was familiar with the victim's car.

Faught said that he gave a statement to Ray Messick on June 3, 1994. At some point, the police asked Faught to help with a composite of the man he saw in the victim's car. About a month later, he looked at a photograph lineup and identified Bobby Bishop as the man he saw in the victim's car. Faught agreed that he did not mention the Appellant in his statement because he could not see who was driving the Firebird.

Faught said he knew that the victim sold cocaine but did not know if he sold marijuana. The day before the victim was killed, Faught was at Tina Blalock's house with the victim. The victim asked Blalock "to go talk to some people for him." Faught said that the victim "was stressing out about talking to these people and getting her to talk

to them for him." Faught thought that the conversation was about the victim's "sales of cocaine." The victim was "stressed out, in a panic mode. Steadily begging her, asking her over and over and over." Blalock repeatedly refused. Faught said that the next time he saw the victim, he was lying "dead in the street."

Kerry Brown testified that one night in April 1994, Dewayne Bowe[2] called and asked if Brown and Tiffany Crawford wanted to go to the movies. Brown said yes, and Mr. Bowe and the Appellant came by and picked them up, but the mall and the theater were closed. Mr. Bowe and the Appellant took Brown and Crawford home. Brown said that he knew Mr. Bowe better than he knew the Appellant. Brown could not remember who was driving that night, but he recalled that they were in a black car.

Brown did not know about the shooting until he was questioned by the police a year or two later. Brown thought that the Appellant and Mr. Bowe may have been dating. Brown said that he knew Bishop and that Bishop was a white man.

On cross-examination, Brown acknowledged that he had difficulty remembering what happened in April 1994, but he remembered that the mall closed at 9:00 p.m. Brown said that Crawford was his girlfriend at the time. He did not recall stopping at 1825 Paul Drive that evening.

Tiffany Crawford testified that in April 1994, she was in a relationship with Kerry Brown. She recalled that the police came to her mother's house sometime after the shooting. The police asked about a night when she and Brown went to the movies with the Appellant and Mr. Bowe, who was also known as "Troop." The Appellant and Mr. Bowe picked up Crawford and Brown at Brown's mother's house. They were in a small, dark car that possibly had only two doors. The theater was in the mall, and both were closed, so the Appellant and Mr. Bowe drove Crawford and Brown home. They arrived home shortly before 11:00 p.m. Crawford said that she and Brown were not with the Appellant and Mr. Bowe very long. Crawford said that on the drive home, the Appellant "said that [if] the police get behind her, she was going to – she wasn't going to stop, I remember that. And I never asked her why." Crawford said that the Appellant had not done anything to make the police want to stop her that night.

Patricia Bowe testified that Dewayne Bowe was her son and that she had heard Brown call him "Troop." Ms. Bowe recalled a night in April 1994 when Mr. Bowe and the Appellant went out, and Ms. Bowe kept the Appellant's baby. Mr. Bowe and the Appellant left around 8:00 or 8:30 p.m. They told Ms. Bowe they were going to a movie

---

[2] Two individuals in this case, Dewayne Bowe and Patricia Bowe, share a last name. For clarity, we will refer to these individuals as "Mr. Bowe" and "Ms. Bowe."

and to get something to eat. Ms. Bowe told the Appellant to bring Mr. Bowe "right back." The Appellant and Mr. Bowe were not gone long. When they returned, the Appellant asked Ms. Bowe to keep the baby for a short while longer because the Appellant did not have a car seat. The Appellant left and then returned, but Ms. Bowe did not recall the exact time she returned. The Appellant asked Ms. Bowe to ride with her to her mother's house and hold the baby, and Ms. Bowe agreed. When they arrived, Ms. Bowe saw a lot of people, cars, and the police in front of the house. Ms. Bowe spoke with the Appellant's mother. A "heavy-set" man told Ms. Bowe and the Appellant's mother that he wanted to take a statement from them. Ms. Bowe drove them to the jail, and she gave a statement to the police at approximately 4:00 a.m.

Ms. Bowe said that she did not see Crawford or Brown that night. She said the only other person she saw was her boyfriend, whom she asked to take her to the store to get diapers and milk for the baby.

Dewayne Bowe testified that in 1994 his nickname was "Troop." He said that the Appellant was an "acquaintance" but that they were not in a romantic relationship. Mr. Bowe recalled a night in April 1994 when he, the Appellant, Brown, and Crawford went out to go to a movie. The Appellant was driving a "relatively new" black car that "looked to be a Firebird." The Appellant picked up Mr. Bowe first and then picked up Brown and Crawford. Ms. Bowe kept the Appellant's baby while they were gone. They went to Shady Brook Mall, and Brown bought a shirt. Mr. Bowe said that they left the mall when it closed, which Mr. Bowe thought was at 11:00 p.m. The Appellant took Brown and Crawford home then took Mr. Bowe home. Mr. Bowe thought that "whatever time the mall closed" was about the time they left.

Mr. Bowe said that the Appellant "was acting really moody and nervous that night." When the Appellant left Mr. Bowe, she said, "I've got to go, I've got to go. I'll be back for the baby." The Appellant returned thirty or forty minutes later, picked up the baby, and Ms. Bowe went with the Appellant to the Appellant's mother's house. Mr. Bowe did not recall why his mother went with the Appellant, but he acknowledged that he gave a statement to the police reflecting that the Appellant "asked [his] mother to go with her so [his] mother could tell [the Appellant's] mother where [the Appellant] had been."

Mr. Bowe acknowledged that he was incarcerated due to a probation violation for a felony conviction for the sale of cocaine. He further acknowledged that in 1994, he was using and selling drugs. He did not know whether the Appellant was involved with drugs at that time. Mr. Bowe said that he did not know Bobby Bishop, Jason Bradburn, or Ricky Bell.

- 16 -

On cross-examination, Mr. Bowe said that he gave two statements to the police, one in 1994 and one in 1997. In one of the statements, Mr. Bowe said that after they left the mall, they went to McDonald's and got something to eat. Afterward, they went to a liquor store, and Brown bought something. Mr. Bowe thought they returned home around 11:00 p.m.

Mr. Bowe said that when he walked in the house, his mother said, "[T]here was an incident that occurred on Ms. Mary's street." His mother also said that detectives had asked where he and the Appellant were and that she had told them where they had gone. After reviewing the statements he gave the police in 1994 and 1997, Mr. Bowe agreed that his statements and his testimony had some inconsistencies regarding whether the Appellant came into his house after they returned from the mall.

On redirect examination, Mr. Bowe agreed that he may have gotten confused and that he may have learned about the incident down the street when the Appellant returned to get her baby.

Robin Osbourne testified that she was incarcerated for a violation of probation. Osborne said that she wrote a letter to the district attorney's office to inform them that she had information regarding the case. Osbourne said that she had not been contacted by anyone when she wrote the letter and that she had not been promised favorable treatment on her pending probation violation in exchange for her testimony. She said that she was not angry at the Appellant and was not testifying against her due to any "bad blood." Osbourne said, "Just on the grounds of what I knew, I felt like it should be told."

Osbourne said that she met the Appellant while they were both incarcerated in the Maury County Jail. Osbourne said they may have met briefly when the Appellant "lived up the road from" her, but they did not know each other well and were not friends.

Osbourne said that she knew Bobby Bishop and that Bishop had been deceased for several years. Osbourne said that she and Bishop "were on and off a time or two" but that they were not engaged or married. When she was younger, they were friends, but her mother did not approve of Bishop because he had been investigated for his involvement in the victim's death. Osborne recalled that one night while they were drinking, Osbourne asked Bishop if he had anything to do with the murder. Osbourne said, "[H]e just kind of done a blank face, you know, like – like he didn't answer. He didn't say yes and he didn't say no."

Osbourne said that she had spoken with defense counsel once and with his investigator twice. She spoke with the investigator in 2016, before she wrote the letter to the district attorney's office. Osbourne conceded that the letter did not "contain exactly

what [she] told the investigator" in 2016. Osbourne agreed that when she wrote the letter, she had a "different mindset about [the Appellant] and her possible involvement than [she] did when [she] met with the investigators before." Osbourne said that she spoke with defense counsel two or three weeks prior to trial and told him a version of events that was similar to what she had written in her letter.

Osbourne said that when she was incarcerated in 2016, she was in a cell with four people, including herself and the Appellant. Osbourne said that after the Appellant met with her lawyer, the Appellant would come back to the cell and "start saying things" about her case. They learned that they knew a lot of the same people, including Bishop. Osbourne said that she did not know much about the victim's murder before her discussions with the Appellant.

Osbourne said that the Appellant never told her everything that happened at one time; instead "[i]t was parts at a time." Regardless, Osbourne said that over the course of one month, she got the following story from the Appellant:

> [The Appellant] said that her and a guy named Troop and a gentleman named Kerry Brown was out riding around, just hanging out. It was throughout the whole evening. She said later in that evening, her and Troop dropped Kerry Brown off. He was no longer with them. They were going to her house to get a diaper bag for her little boy that was over at her sister's house. And when they got to her mother's house, she had went in to get the diaper bag and she had left Troop outside. And while she was in the house getting the diaper bag ready, when she come back out, there were two guys outside with Troop – a guy she called Troop.
>
> . . . .
>
> Then – but when she come back outside, the car had been moved. He had, I guess, parked it and met up with the two guys somewhere outside of her mother's house. And she got in the car with Troop and these two guys and Troop and a guy had left and she's sitting in the car with the gentleman and they're sitting there doing drugs, cocaine, whatever they were doing. And they were waiting on Troop and the other guy to come back. Well, she didn't know these two guys. And she's with a guy in the car. And as they're sitting there hanging out, she figures out – or she asks the guy his name,

- 18 -

and it was Rick Bell. And the longer they sat there and talked, or whatever, she had asked who had Troop left with. And she had mentioned a Jason Bradburn.

Well, they sat there and waited for Troop and Jason to come back. And as they were waiting, they were sitting there and a pizza delivery guy pulls up at her mother's house. And they're still sitting in the car. And they're watching this guy, this pizza guy, go up to her mother's door. And he knocks on the door. And her mother comes to the door. And she turns the pizza guy away. And the pizza guy goes back to get in his car. And he's in the car and he's looking around like – he's got his light on and he's, you know figuring out, I guess, you know, why she didn't accept the pizza.

And she said at this time there was a guy that come from each side of the house. And at this point, it was a black male and a white male. And she had – when they approached the car, the pizza guy had gotten out and there was, like, some, like, arguing or loud verbal stuff going on. And Rick was getting out of the car and I guess she was fumbling around. I mean, she didn't – she don't – didn't go into detail on who shot, or whatever, but by the time Rick had gotten out of the car, she had – she heard two gunshots.

Well, there was a lot of commotion going and Troop had come to her and asked her to drive the pizza guy's car and she gets in it and she can't drive a five speed so she runs back to the car and asked him if he would drive it and so she got in the car that she was in and she followed him to a church.

Now whether – where the other two guys, or whatever, the pizza guy, you know, they wasn't around. And she followed them to a nearby church. And he dropped them off and she picked them up.

Osbourne said that the Appellant eventually said that a black man named Troop came from the side of her mother's house and approached the victim's car window. The Appellant identified the other person as a man named Jason. The Appellant never said who fired the shots. The Appellant said she tried to drive the victim's car but could not

- 19 -

because it was a stick shift. Troop got into the victim's car and drove it, and the Appellant drove the other car and met him at a church. Osbourne said that prior to speaking with the Appellant, she did not know that the victim had been shot.

Osbourne said that she did not know Jason Bradburn, Bobby Bishop, Ricky Bell, or Troop. The Appellant told Osborne that after she picked up Troop at the church, they went to the Appellant's sister's house. The Appellant never mentioned Troop's mother, and she never mentioned Bishop except to say "that he had drove the same kind of car that was involved in the murder." Initially, the Appellant tried to make Osbourne believe Bishop was driving his black car that night, but later the Appellant revealed that she was driving a black car and that she was at the scene of the shooting.

On cross-examination, Osbourne acknowledged that she first spoke with the defense's investigator, Jennifer Greer, on December 13, 2016; Osbourne was out of jail at that time. Osbourne said that she did not recall telling Greer that she and Bishop were best friends, asserting that she and Bishop were acquaintances. Osbourne acknowledged that Bishop "[m]ay be" the father of her daughter, but she said that did "[n]ot necessarily" make them friends.

Osbourne acknowledged she told the defense that Bishop drank "[e]very time [she] was around him, which wasn't a lot." She did not recall telling the defense that Bishop said "he had something to do with the Papa John's murder and that he always made himself the trigger man."

Osbourne thought she wrote the letter to the district attorney's office in October 2017. She acknowledged speaking to defense counsel and Greer at the beginning of February 2018 while she was in jail. She remembered them asking why she had told them something different in December 2016, and that she responded she "didn't know how much different it was." Osbourne said that in February 2018, she gave the defense the same details she gave during her direct testimony. She thought her stories were "[p]retty close." She acknowledged leaving out some details, explaining, "I didn't speak with you about it because I was already going to speak with the State about it. . . . So I didn't tell everything to y'all."

Osbourne said that when she knew Bishop, he had a 1996 red Grand Prix. Osbourne acknowledged that a "broke down" Firebird was parked in Bishop's mother's yard.

Osbourne said that she was in jail for a probation violation on a conviction for sale of methamphetamine. The violation was based on a new drug charge incurred four months after she spoke with the investigator.

On redirect, Osbourne said that she did not think what she told Greer in December 2016 was "any different" from what she later told the State but that she "just didn't tell [the defense investigator] everything." Osbourne said that the information came from the Appellant and denied that she had made up some of the details to get the Appellant in trouble.

Osbourne said the Appellant never explained why she drove away without checking on the victim, and the Appellant never said what she did after she arrived at her sister's house. Osbourne asked the Appellant how Bradburn and Bell got to the scene, and the Appellant said that she did not know. The Appellant never told Osbourne that Bell participated in the murder; however, she said that "[Bell] was getting out of the car, like in the midst of getting out." The Appellant said that either Bradburn or Troop shot the victim.

Shannon Arntz testified that in 1994, she and the Appellant were best friends and that they had been friends since eighth or ninth grade. Arntz said that she quit high school before the eleventh grade and that the Appellant was out of school but had not graduated. They lived near each other. Arntz said that she lived next door to Thomas Arthur's house and that her house was "diagonal" from the Appellant's house. At the time, Arntz' sister was married to Lawrence Nelson.

Arntz said that the Appellant got a driver's license before Arntz. The Appellant sometimes drove a black 1994 Firebird that Thomas Arthur had recently bought. The Appellant and Arntz thought "[i]t was a hot car." Arntz said that both she and the Appellant occasionally drove the Firebird. Arntz recalled that when the victim was shot, she and the Appellant were watching Thomas Arthur's house, dog, and car for two weeks while he was in Michigan.

Arntz said that the weekend of the murder, she was in Florida for spring break, and the Appellant had the Firebird. Early Sunday morning, her sister called and told her what had happened. Her sister told her that she needed to come back to Columbia, find the Firebird, and return the car and the keys to Thomas Arthur's house. Arntz returned immediately. Upon her return, she noticed that the Firebird was not parked at Thomas Arthur's house. Arntz went into her house, and when she came outside later, the Firebird was parked at Thomas Arthur's house. Arntz said that Thomas Arthur was not there and could not have driven the car home.

Arntz said that she and the Appellant did not discuss what happened that night until they went on a trip to Michigan. During the drive, they saw a sign they thought was for a rest area, but it was for a weigh station. Arntz was driving, and when they went

through the weigh station, the Appellant was upset and said, "[W]e're going to jail." Arntz did not have a driver's license and explained that at most, she would get a ticket for driving without a license. The Appellant responded, "No, we're going to go to jail because I killed [Chris Heiss]." The Appellant told Arntz, "I called Papa John's and had the pizza delivered to my house." The Appellant said that the victim "owed $7,000 in cocaine money" to Judge Matthews, a general sessions judge in Maury County who was deceased at the time of trial. The Appellant also mentioned Jason Bradburn, Rick Bell, and "Bobby." The Appellant said that the judge had ordered Bradburn "to do the hit," meaning to kill the victim. The Appellant said that "[s]he ran [the victim] over. . . . [S]he just said I ran him over six times." The Appellant said that she ran over the victim that many times because she "was scared" that he was not dead.

Arntz said the Appellant did not mention having trouble driving the victim's car and did not say anything about the Firebird. The Appellant did not say who shot the victim, but Arntz knew from the Appellant that the victim had been shot twice.

Arntz said that she gave a statement to the police in May 1994. In the statement, she did not mention that the Appellant ran over the victim. Arntz explained, "I was scared of her. You know, what did you want me to do."

Arntz acknowledged that she was providing more details at trial than she had in her 1994 statement. She explained, "In 1994, I had my life threatened, not only by them, but I also had a threat with 25 years of my life being sentenced to prison for something I didn't even do." Arntz did not feel safe telling the story in 1994, because some of "the cops" were involved. She felt safer by the time of trial because the general sessions judge was dead and could no longer do anything to her. Arntz said that she had no reason to lie about what the Appellant told her. She said that in 1994, she tried to help by giving detectives names of people who may have been involved, but they did not "listen."

On cross-examination, Arntz acknowledged that she had been convicted of aggravated assault. She explained that she and the Appellant went to Michigan because Arntz was from Michigan. Arntz said that when Thomas Arthur left, he gave the women the keys to his car. Arntz maintained that when she was not present that the Appellant was in charge of the car.

Investigator Tommy Goetz testified that he had worked in law enforcement since 1981. During that time he had worked for the Columbia Police Department, the Mount Pleasant Police Department, and also with the drug task force. On September 2, 2014, after he retired as Mount Pleasant Chief of Police, he began working as a criminal investigator for the district attorney's office, spending "most of [his] time on cold case homicides." The victim's case was designated as a cold case.

Investigator Goetz said that when he started his investigation into the victim's case, he spoke with Detective Sanders, who was investigating the case for the Columbia Police Department. They began working on the case together. Investigator Goetz looked at the casefile on the victim's homicide. He said that the file "was enormous."

Investigator Goetz said that during his investigation, he interviewed approximately thirty-four witnesses who had been interviewed previously by the Columbia Police Department. One of those witnesses was Shannon Arntz, whom he interviewed in late November or early December 2014. When he told Arntz he wanted to interview her about the victim's murder, she "was welcoming and invited [him] into her home." She told him what she knew about the night of the shooting. Afterward, Investigator Goetz told Detective Sanders about Arntz' statement. Investigator Goetz said that he had heard Arntz' trial testimony and that it was consistent with what she had told him in her interview.

Investigator Goetz said that he knew Jason Bradburn and Ricky Bell from previous investigations with the drug task force. Investigator Goetz knew that Bradburn was "associated" with Bell in narcotics. Investigator Goetz knew Dewayne Bowe's nickname was Troop and "knew of" Bobby Bishop and the Appellant. Investigator Goetz knew the name Kerry Brown and also "knew of" the Appellant but never had any interactions with her before this case. Investigator Goetz was part of an undercover operation in which the drug task force had purchased a large amount of marijuana from Jason Bradburn.

Investigator Goetz acknowledged that Arntz "may have caught everyone off guard" when she mentioned Judge Matthews. Investigator Goetz said that while was working as a patrol officer and with the drug task force, he heard "rumors about Judge Matthews being involved with drugs" but he had never seen any credible evidence that confirmed the rumor. Investigator Goetz said, "That's almost like an urban myth. You have always heard that, but, you know." Investigator Goetz agreed that the judge "was a respected member of this community and [that he served] Maury County for a long time." The judge was deceased at the time of trial.

Investigator Goetz said that all the telephone calls of inmates in the Maury County jail were monitored except the calls to their attorneys. Investigator Goetz stated that the Appellant went to jail at the end of March or the first of April 2016 and that he had listened to her calls from the jail. He said that "[s]he was pretty careful" during her conversations. She never "[d]irectly" confessed her involvement in the victim's death, but a call she made on April 22, 2016, led Investigator Goetz to believe she "was involved or at least had intimate knowledge" of the victim's death.

The State played the recording of the April 22, 2016 telephone call. Investigator Goetz explained that the Appellant had called Cameron Pillow. From other telephone calls, Investigator Goetz surmised that the Appellant and Pillow were in a romantic relationship. Eventually, Pillow asked the Appellant about the case, and "they start talking about [it] using initials." They referred to someone with the initials J.B., who Investigator Goetz thought was Jason Bradburn. They said that they thought R.B. was in "lockup." Investigator Goetz stated that at the time, Ricky Bell was in prison in Hardin County. The Appellant said, "K.B. that's exactly who set me up." Investigator Goetz thought they were referring to Kerry Brown, but he had not seen any indication that Brown "set up" the Appellant.

On cross-examination, Investigator Goetz acknowledged that the discovery provided to the defense included the names of Bradburn, Bell, Dewayne Bowe, Brown, and Bishop. He further acknowledged that it would not have been unusual for defense counsel to discuss the information in the discovery with the Appellant prior to trial. However, Investigator Goetz had heard the Appellant complaining during several telephone calls that defense counsel was not providing her with discovery.

On redirect examination, Investigator Goetz reviewed defense counsel's request for discovery. The request was filed on May 9, 2016, after the Appellant made the April 22 telephone call mentioning the initials of various individuals involved in the victim's murder.

Julio Cabral testified as the first defense witness. Cabral said that he had worked "off and on" for Papa John's, Domino's Pizza, and Pizza Hut for several years. He said that on the night of April 2, 1994, he was working as a delivery driver at Papa John's with Kennedy and the victim. Cabral did not remember having to enter a code on the computer when taking a telephone order. He agreed that after the order was entered, the computer printed a ticket to reflect the order.

Cabral remembered that the order in question came in near the end of the evening. All of the drivers except the victim and Cabral had gone home, and Kennedy was still in the store. Cabral thought he took the order for the delivery the victim was on at the time of his death. Cabral recalled that he had just returned from a delivery and that he was the only one in the front of the store when the telephone rang. Cabral said that he spoke with detectives at the time and told them that he answered the telephone, took the order, entered the order into the computer, and made the pizza. While waiting for the pizza to finish baking, he made a pizza for himself. His pizza was ready right after the pizza for delivery was ready. By that time, the victim had returned to the store. Cabral wanted to eat, so he asked the victim to make the delivery, and the victim agreed to go.

- 24 -

Cabral thought the person placing the order was male. The person had no accent, and the voice did not "bear any significant markings of any sort of ethnicity." Cabral did not think the person had ordered a pizza before because he had to enter a telephone number and address into the computer.

Cabral said that after the victim left with the pizza, another order came in, and Cabral had to make the delivery. When Cabral returned to the store, he noticed a "commotion" and learned that something had happened to the victim.

On cross-examination, Cabral said that his first job at a pizza restaurant was at Papa John's. Afterward, he worked at Pizza Hut and Domino's. He estimated that he worked in pizza restaurants for seven to ten years. He could not estimate how many thousands of pizza orders he had taken over the years. Cabral said that he was "pretty sure" he was the one who took the pizza order the victim attempted to deliver. He explained, "I mean, at the time that this happened, when I went to speak with detectives, I was I would say a hundred percent positive that I took the order." Initially, Cabral said, "From what I remember of the procedures in the store, we did not have to enter any code into the machine." He acknowledged that Kennedy was in the store and that Kennedy was answering the telephone and taking more orders than he was. Cabral examined the order for the pizza and acknowledged that it included an operator number that identified Kennedy as the person taking the order. Cabral said that the operator was "[n]ot necessarily" the person who took the order. He explained, "From what I remember of working in the store is that the managers would log into the machines and have them logged and ready for you to just take an order." Nevertheless, Cabral conceded that Kennedy, as a manager, probably had more knowledge about Papa John's computer system than he had.

Jennifer Greer, the defense's investigator, testified that in December 2016, she interviewed Robin Osbourne inside Osbourne's parents' house where Osbourne was living. At the beginning of the interview, Greer identified herself and explained that she worked for the defense. During the interview, Osbourne said that

> Robert Bishop was a friend of [hers]. And when he would get tipsy, he would tell her that he had something to do with the pizza boy's murder. And each time I asked her how many times he had told this stor[y] and she said multiple times and every time he put himself as the shooter.

Greer said that the interview lasted approximately thirty minutes.

On cross-examination, Greer said that Osbourne did not seem impaired or intoxicated at the time of the interview.  Greer acknowledged that she interviewed Osbourne again a few months later while Osbourne was in the Lewis County Jail.  During the second interview, Osbourne's story was "quite a bit different," and she maintained that part of her earlier statement was not true.  The Appellant told Osbourne that she went to her mother's house to get a diaper bag, that Bradburn and Bell arrived at the scene, and that after the shooting, Mr. Bowe told the Appellant to drive the victim's car away from the scene.

At the conclusion of the trial, the jury found the Appellant guilty of first degree murder and felony murder in the perpetration of a robbery.  The trial court merged the convictions and sentenced her to life imprisonment.  On appeal, the Appellant challenges the sufficiency of the evidence sustaining her convictions.

## II.  Analysis

On appeal, a jury conviction removes the presumption of the Appellant's innocence and replaces it with one of guilt, so that the Appellant carries the burden of demonstrating to this court why the evidence will not support the jury's findings.  See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).  The Appellant must establish that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt.  See Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e).

Accordingly, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom.  See State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983).  In other words, questions concerning the credibility of witnesses and the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact, and not the appellate courts.  See State v. Pruett, 788 S.W.2d 559, 561 (Tenn. 1990).

The guilt of a defendant, including any fact required to be proven, may be predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence.  See State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999).  Even though convictions may be established by different forms of evidence, the standard of review for the sufficiency of that evidence is the same whether the conviction is based upon direct or circumstantial evidence.  See State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011).

In order to obtain the Appellant's conviction for first degree premeditated murder, the State was required to prove, beyond a reasonable doubt, that the Appellant committed

the "premeditated and intentional killing of [the victim]." Tenn. Code Ann. § 39-13-202(a)(1). Premeditation "is an act done after the exercise of reflection and judgment" and "means that the intent to kill must have been formed prior to the act itself. [However,] [i]t is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time." Id. at (d). Although there is no concrete test for determining the existence of premeditation, Tennessee courts have relied upon certain circumstances to infer premeditation. See State v. Pike, 978 S.W.2d 904, 914 (Tenn. 1998). Specifically, the following factors have been used to support a jury's inference of premeditation: (1) the Appellant's prior relationship to the victim which might suggest a motive for the killing; (2) the Appellant's declarations of intent to kill; (3) the Appellant's planning activities before the killing; (4) the manner of the killing, including the Appellant's using a deadly weapon upon an unarmed victim, killing the victim while the victim is retreating or attempting escape, or killing the victim in a particularly cruel manner; (5) the Appellant's demeanor before and after the killing, including a calm demeanor immediately after the killing. See Pike, 978 S.W.2d at 914-15; State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997).

The Appellant was also charged with the felony murder of the victim, which in the instant case is defined as "[a] killing of another committed in the perpetration of or attempt to perpetrate any . . . robbery." Tenn. Code Ann. § 39-13-202(a)(2). Robbery is defined as "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." Tenn. Code Ann. § 39-13-401(a). The State did not allege that the Appellant was the person who actually shot and killed the victim but pursued convictions based upon a theory of criminal responsibility. "A person is criminally responsible as a party to an offense if the offense is committed by the person's own conduct, by the conduct of another for which the person is criminally responsible, or by both." Tenn. Code Ann. § 39-11-401(a). Criminal responsibility for the actions of another arises when the defendant, "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, . . . solicits, directs, aids, or attempts to aid another person to commit the offense." Tenn. Code Ann. § 39-11-402(2).

On appeal, the Appellant contends that no physical evidence tied her to the crime. She notes that her fingerprints were not found on any items recovered from the car and that no DNA evidence implicated her. However, it is well-established that "[c]ircumstantial evidence alone is sufficient to support a conviction, and the circumstantial evidence need not exclude every reasonable hypothesis except that of guilt." State v. Wagner, 382 S.W.3d 289, 297 (Tenn. 2012).

Further, the Appellant contends that no eyewitnesses placed a female at the crime scene. She points to Faught's testimony that the person he saw trying to start the victim's

car near the intersection was male and that Faught was unable to determine who was driving the Firebird at the intersection. Regardless, numerous witnesses saw the Appellant driving the Firebird throughout the night or rode with her in the vehicle. The State also provided testimony that the black Firebird was seen leaving the scene immediately after the gunshots, followed closely by the victim's car. Moreover, the Appellant was driving the car when she returned to Ms. Bowe's home after the shooting. Additionally, the Appellant told Osborne and Arntz that she drove the Firebird to and from the murder and provided details regarding her role in the victim's death.

The Appellant also complains that Osbourne and Arntz were not credible witnesses. It is well-established that determining the credibility of witnesses is within the purview of the jury. See State v. Millsaps, 30 S.W.3d 364, 368 (Tenn. Crim. App. 2000) (stating that "the weight and credibility of the witnesses' testimony are matters entrusted exclusively to the jury as the trier[ ] of fact"). In the instant case, the jury clearly resolved the issue of credibility in the State's favor. We may not now reconsider the jury's credibility assessment. See State v. Carruthers, 35 S.W.3d 516, 558 (Tenn. 2000).

In her brief, the Appellant acknowledges that the State established sufficient proof that the shooter committed first degree premeditated murder. She maintains though that the State failed to prove that she was criminally responsible for the crimes. We conclude that from the proof, a jury could have concluded that the Appellant acted with the intent to promote or assist in the commission of the crimes and aided or attempted to aid in the crimes. Once again, in the light most favorable to the State, the proof showed that the Appellant placed a pizza order to lure the victim to her mother's house. While the victim waited in the car, the men approached the victim and shot him. After the victim was shot, the Appellant repeatedly ran over the victim with a car to ensure that he was dead. Afterward the Appellant attempted to drive the victim's car from the scene but was unable to because it had a manual transmission. Instead, she followed the men to a church and picked them up in the Firebird.

The Appellant also contends that the State failed to prove felony murder. Our supreme court has explained:

> The felony murder rule applies when the killing is "done in pursuance of the unlawful act, and not collateral to it." Farmer v. State, 201 Tenn. 107, 296 S.W.2d 879, 883 (1956). "The killing must have had an intimate relation and close connection with the felony . . . and not be separate, distinct, and independent from it." Id. (quoting Wharton on Homicide, § 126 (3rd ed.)). The killing "may precede, coincide with, or follow the felony and still be considered as

- 28 -

occurring 'in the perpetration of' the felony offense, so long as there is a connection in time, place, and continuity of action." State v. Buggs, 995 S.W.2d 102, 106 (Tenn. 1999). Nevertheless, the "intent to commit the underlying felony must exist prior to or concurrent with the commission of the act causing the death of the victim." Id. at 107. "[A] jury may reasonably infer from a defendant's actions immediately after a killing that the defendant had the intent to commit the felony prior to, or concurrent with, the killing." Id. at 108.

State v. Thacker, 164 S.W.3d 208, 223 (Tenn. 2005).

The proof revealed that the Appellant initiated the robbery by placing the telephone pizza order which lured the victim to the scene. While the victim attempted to deliver the pizza order to the Appellant's residence, Bradburn and Mr. Bowe waited until the victim returned to his car to approach the victim. The Appellant heard a gunshot coming from the direction of the men. The Appellant repeatedly ran over the victim to ensure he was dead prior to taking his vehicle.

After the victim was killed and left in the middle of the street, the Appellant by attempted to drive the victim's car away from the scene. However, upon discovering that she was unable to drive the victim's car, which had a manual transmission, the Appellant got out of the Nissan, got in the Firebird, and followed the Nissan away from the scene. After they were forced to abandon the victim's vehicle, the Appellant picked up the men and drove to the church. We conclude that the evidence was sufficient to support the Appellant's convictions.

## III. Conclusion

The judgment of the trial court is affirmed.

_____
NORMA MCGEE OGLE, JUDGE